### EARNEST THOMPSON v. THE STATE.

No. 2862.   Decided December 2, 1903.

for rehearing refused December 18, 1903.

**1.—Continuance—Impeaching Testimony.**

On a trial for rape, where a continuance was asked on account of the absence of his leading counsel, who was sick, he having other counsel, and who was also alleged to be a material witness for appellant, he having been subpoenaed, but was unable to appear on account of his sickness; and it was disclosed that the evidence expected to be brought out by him was for the purpose of impeaching another witness. Held, his testimony not having been set out, the court is not authorized to supply same by intendment, and a continuance, as a general rule, will not be granted for impeaching testimony, or for the absence of one where defendant is represented by other counsel.

**2.—Same—Alibi—Diligence.**

A continuance was also asked on account of the absence of the witness Morris, also subpoenaed, and who "from some cause unknown to defendant was not present;" and that he expected to prove by said witness that at the time the offense was committed defendant was with him at a place a considerable distance from that where the offense was committed, and remained with him during the afternoon. Held, the application should have shown the particular place where defendant and the witness were during the afternoon, and that the diligence was not sufficient.

**3.—Same.**

Where the record does not show any effort to shift the offense to another party, a continuance will not be granted for a witness to prove that he (an officer) had been telephoned by the family of prosecutrix, that the offense had been committed by a boy, "Haywood," and also that prosecutrix telephoned him she suspected it was the boy Haywood who had assaulted her.

**4.—Motion to Quash Indictment and Special Venire—Race Discrimination.**

Where it was shown by the evidence that of the ten thousand or more voters in the county that there were some six or seven hundred negro voters, and that no negroes were selected by the jury commissioners to serve

on the grand jury, or the special venire in this case; that the commissioners were white men, and it was not shown how many of the negro voters were otherwise qualified, the motion of defendant to quash the indictment and special venire, on the ground of race discrimination, was properly overruled.

### 5.—Same—Evidence.

Where it was contended, on motion to quash the indictment, that the negro race was discriminated against in the selection of the grand and petit juries, the defendant being a negro; and it was proven by one of the commissioners who selected the jury for the term from the tax rolls of the county that the name of no negro was presented or drawn as a grand juryman for said term, and that if the name of a negro who was qualified had been presented he would have been placed on the grand jury. Held, no discrimination is shown against the colored race in the formation of either the grand or petit juries, and the court did not err in failing to quash the indictment or special venire.

### 6.—Foot Tracks—Expert Evidence.

Where, on a trial for rape, appellant objected to the evidence of certain witnesses regarding tracks found at the scene of the alleged outrage that were similar to tracks made by appellant on the ground, that said witnesses did not qualify as experts, or persons familiar with the subject testified about. Held, the evidence as to similarity of tracks does not require expert testimony, and it not being shown that the witnesses made measurements of the tracks found at the scene of the crime with those of appellant, the court did not err in admitting the testimony.

### 7.—Same—Opinion Evidence—Charge.

Where appellant complained that the court erred in failing to instruct the jury to disregard the testimony of State's witnesses as to their opinion that the tracks made at the alleged place of assault were made by the feet of defendant as measured by them at Atkins; Held, recurring to the statement of facts, that there was ample testimony to authorize the admission of the evidence of the witnesses, and the court was not required to instruct the jury to disregard said tracks.

### 8.—Motion for New Trial—Bill of Exceptions.

Where no bill of exceptions has been reserved to the character of testimony urged as error, nor to certain jurors objected to who sat on the trial, and is only alleged as one of the grounds of the motion for new trial, Held same can not be considered.

### 9.—Verdict—Evidence Sufficient.

Where a reversal is contended for on the ground that the evidence is not sufficient to sustain the verdict, and the evidence of prosecutrix is of a positive character as to the occurrence, and the evidence of identity of appellant as being the party who perpetrated the outrage is circumstantial, but ample, and fully complies with the rule governing circumstantial evidence and shows to a moral certainty, to the exclusion of any reasonable hypothesis, beyond any doubt, that appellant, beforehand, formed the design to perpetrate an outrage upon prosecutrix, Held, amply sufficient to support the verdict rendered.

Appeal from the District Court of Bexar.   Tried below before Hon. John H. Clark.

Appeal from a conviction of rape; penalty, death.

The indictment, which was filed June 28, 1902, charged appellant, Ernest Thompson: 1.  "With the rape of Victoria Nickle, a female, then and there being under the age of 15 years."  2.  "With the rape of Victoria Nickle, a woman," etc.

Under his plea of not guilty, he was convicted and his punishment assessed at death, from which said judgment, after his motion and amended motion for new trial had been overruled in the court below, he appeals to the Court of Criminal Appeals.

The matters pertaining to appellant's motions to quash the indictment and special venire, on the ground of race discrimination, he being a negro, is sufficiently presented in the opinion.

The evidence as to similarity of tracks of defendant with those found at the scene of the crime, the witness Mahula, for State, testified: "I am constable of St. Hedwig, Bexar County, Texas. First heard of the assault on Victoria Nickle on June 25, 1902. Captain James Trainer, justice of the peace at St. Hedwig, and I went to the place where she was assaulted on the 26th. Walter Adams and Dick Adams were also with us at the time. We saw tracks at the place. They were barefoot tracks coming from the east, thence they went southeast, towards Jeff Thompson's. We measured the tracks. The tracks were short and broad. Adolph Thompson and Earnest Thompson were arrested on June 27, 1902. * * * After they were arrested we separated them, I taking charge of Earnest Thompson, Deputy Sheriff Trainer of Adolphus. The track we first discovered was walking track, going down the fence. Then saw tracks turn at right angles to tracks going down the fence, and they were running tracks, and in the direction of Jeff Thompson's. We saw the tracks at the place where the girl was assaulted. There appeared to have been a scuffle at this place. We took measurements of the tracks going down the fence and of the running tracks, and the tracks at the place where the girl was assaulted, and they were all alike. At Adkins, we made Ernest Thompson stand up, and took the measurement of his bare foot, and it corresponded exactly with the other tracks we had seen and measured. We used a stick in measuring the tracks going down the fence and those leaving the place and the stick fitted the trace of Ernest Thompson made while standing barefooted at Adkins. The soil at the place where the girl was assaulted and along the fence, and where the man ran away was sandy. The soil at Adkins is sandy, but not so much so as that in the pasture where the girl was assaulted. * * * I have had considerable experience in tracking; in fact, can track most anything."

J. M. Trainer, justice of the peace at St. Hedwig, testified substantially as did Mahula.

Dr. Berry testified: "Have been a physician for nineteen years, and county physician for eight years. Was county physician in June, 1902, and I make an examination of Victoria Nickle, once alone and once with Dr. Russ. We found no bruises about the body but there were lacerations about the internal parts of the vagina, inside of the inner lip, about three-quarters of an inch to an inch. There had been a penetration. I made this examination a day or so after the assault. I will say, that the penetration which I found in the parts of the girl, Victoria Nickle, could have been made by the male organ; it might have been done by something else, but it is not probable."

Prosecutrix, Victoria Nickle, on behalf of the State, testified: "I live three or four miles from St. Hedwig with my parents. * * * I am now 15 years old. I was born in December, 1887. In June, 1902, I was going to a school at St. Hedwig conducted by the Sisters. The school is three or four miles from where I live. I was at school on the 24th day of June, 1902, getting there about 9 o'clock in the morning.

Left that evening at 4 o'clock. Went home, part of the way by the road and part of the way through the pasture. I was alone and had my books in my arms. I traveled the road about half a mile, then went into Jones' pasture. Before going into Jones' pasture, I went through Prizer's pasture. In going through Jones' pasture, I went by a trail. I had gone that road to school all the time. While going along the trail I saw the man who threw me down. I hadn't gone far when I saw him. Was then in Prizer's pasture, and about half a mile from home. When I first saw the man he was coming towards me, not very far away. He had on no clothes and was entirely naked, and had a handkerchief tied over his face with holes for the eyes. The nearest house was probably fifty feet or more, not exactly a quarter of a mile, but was vacant. The next house was a quarter of a mile away. The country about there was brushy. The man threw me down, catching me by the right shoulder and by the throat. I don't know how many hands he used. He caught me with both hands. I fell straight on my back. He also caught me by the throat and put his knee on my chest, and put his thing into me between my legs. I felt it inside me. I do not know how deep, but I felt it in me. He choked me, and said that he was not going to turn me loose until I died. I was doing nothing but kicking and scratching and asking him to turn me loose. I was worn out when he got through. He said he would not turn me loose. He raised my dress up and put his thing into me in the hole between my legs. I felt it in me. He had one hand on my throat, and I was kicking. I scratched him on the back, on the right side. I had on a red top dress and a white skirt. I don't know how long he kept me there, but not very long. When he got up, he ran through the brush in a southeastern direction. The place where he threw me down had grass on it, and after I got up the grass was rumpled. The land there was sandy. My hair and dress had grass burs in them. I had sand in my hair. He was a black man with black curly hair. I could not see his face for the handkerchief. I don't know who he was. After I got up I went home and told my mother. This was in Bexar County, Texas. I am not married either to defendant or any one else. I was 14 years old when this happened. I had followed this trail for about four months in going and coming from school. I went home just as fast as I could. I never gave my consent to the defendant."

Adolphus Thompson, for State, testified: " * * * Will be 21 years old next July. Ernest Thompson is my brother. On June 24, 1902, me and my brother and Zeke Williams were tying fodder until about 10 o'clock a. m. when I finished. Ernest Thompson finished about 11:30 a. m., and he, Williams and myself went to Williams' house. * * * My brother and I started to my grandfather's, and from there were going to see about a load of watermelons. We were afoot, and while walking along my brother Ernest told me that when the Nickle girl came along he was going to ask her for some. I told him he had better not do it, and to let that girl alone or he would get into trouble.

The Nickle girl lived at the corner of the land near Jones'. When we got near Jones' pasture, where the trail was, he told me again that he was going to ask the Nickle girl to give him some as she passed along. I told him that he could not, for I would take the gun we had and kill him. I told him that lots of negroes were getting their necks cracked for fooling with white girls. He answered me by saying that he would fix himself so she would not know who it was. I asked him how, but he would not tell me. We walked along a short distance when he asked me for the gun, saying he was going across the pasture [this being the same pasture the Nickle girl came through coming from school] to shoot a rabbit, and for me to meet him at grandfather's gate. I went on around to grandfather's gate, but Ernest was not there. * * * About 4:30 my brother came back. He had killed no doves. * * * The place where they say the Nickle girl was assaulted is about 700 or 800 yards from my grandfather's, Jeff Thompson, and about 400 yards from where I left Ernest when he went through the pasture.

The attempt of appellant to prove an alibi is sufficiently shown in the opinion below.

Appellant made a motion for rehearing on the ground of newly discovered testimony, which, it was claimed, established conclusively the fact that appellant was less than 16 years old at the time of the alleged assault, and therefore was not subject to the death penalty which was assessed against him in the trial court. This motion was overruled.

This is the second appeal taken in this case.

No brief for appellant found in the record.

*J. B. Butler* and *A. B. Cowen,* for appellant, filed motion for rehearing.

*Howard Martin,* Assistant Attorney-General, for the State.—Appellant contends that the court erred in not quashing the indictment and special venire, his insistence being that he was intentionally discriminated against on account of his race or color in the formation of the grand jury and selection of the special venire. In this the court's action was proper. The burden of proof was upon appellant to show that he had been intentionally discriminated against in the formation of the grand jury and in the selection of the special venire. This he failed to do. On the other hand the evidence shows affirmatively from the testimony of the jury commissioners that he was not discriminated against in that particular. Martin v. State, 6 Texas Ct. Rep., 909; Hubbard v. State, 4 Texas Ct. Rep., 660; Parker v. State, 3 Texas Ct. Rep., 637.

The evidence supports the conviction. The real issue in the case was as to the age of appellant. He insists that he was not 17 years of age. The burden of proof was upon him to establish this fact. The evidence is conflicting on this issue, and the State's evidence is sufficient to sustain the verdict of the jury in this particular.

45 Crim.—26.

HENDERSON, JUDGE.—Appellant was convicted of rape, and his punishment assessed at death; hence this appeal.

Appellant moved for continuance because of the absence of his leading counsel, J. M. Eckford, Esq., who is shown to have been sick at the time of the trial. It is shown that appellant had other counsel, and the record does not disclose that he suffered any injury on account of the absence of his leading attorney. In this connection appellee also asked for continuance on account of the absence of said J. M. Eckford, Esq., who he alleged was a material witness for him, and who had been duly subpœnaed, and was unable to appear on account of sickness; that appellant expected to prove by said witness that Adolphus Thompson, a material witness for the State, told him that he had been frightened into making statements against defendant, and that said statements were untrue. What these statements were that Thompson disclosed to Eckford is not made to appear, and we are not authorized to supply this by intendment. Moreover, if it was intended here to insist on a continuance in order to impeach Thompson by Eckford, we would observe that as a general rule continuances are rarely granted for impeaching testimony.

Appellant claims that the case should be continued on account of the absence of Frank Morris, who had been subpœnaed, and from some cause unknown to defendant was not present. Defendant says he expected to prove by said witness that, at the time the alleged offense was committed, defendant was with him at a place a considerable distance from the place where the offense was committed and remained with him during the afternoon. This statement should have been made with more regard to particulars. Certainly appellant could inform his counsel at what particular place he was during that afternoon with the witness Morris, and it should have been shown in the application. Besides, the diligence for this witness was not sufficient.

A continuance was also craved because of the absence of Andrew Strelsick. By this witness appellant expected to prove that the family of "Victoria Nickle telephoned the officer that the offense was committed by the boy Haywood—the boy who rides the jack." The record does not disclose that any effort was made to shift this offense upon the boy Haywood; and, from the evidence, it would be immaterial even if the prosecutor, Victoria Nickle, had herself testified that she telephoned the officers that she suspected it was Haywood who had assaulted her.

Melvin Pitman was another absent witness. The application shows that it was expected to be proved by him that he saw defendant in company with Frank Morris at the time the offense was alleged to have been committed. This statement is equally as indefinite as that heretofore treated relating to the witness Morris. We do not think the court erred in overruling the motion for continuance.

On the trial appellant made a motion to quash the indictment, because he being a negro, in the formation and impanelment of the grand jury no negro was drawn—the negro race being discriminated against in the drawing. The motion further alleged that within the limits of Bexar

County there are seven thousand qualified jurors, of which at least six or eight hundred are negroes, qualified to sit upon juries. A similar motion was made to quash the special venire. The court appears to have heard evidence on this subject, and to have overruled these motions, to which appellant excepted. The witnesses show there were ten or eleven thousand voters in Bexar County; that of these six or seven hundred are negroes; that no negroes were drawn on the grand jury, and within their knowledge none have ever been drawn; that some times negroes sat on petit juries. But it is nowhere shown by any of the witnesses how many of the alleged six or seven hundred negro voters in Bexar County were qualified voters. Besides being a voter, a person must be a freeholder or householder and able to read and write, and other qualifications not necessary to be mentioned. It may be that out of this population of six or seven hundred (about one-twelfth of the voters in the entire county) but few possessed the necessary qualifications to serve as grand or petit jurors. One of the commissioners who selected the jury was examined, and he states that all of the jury commissioners were white men, and that they had the tax rolls and city directory before them when they selected the grand and petit juries for the May term, 1902; that no negroes were drawn to serve as grand or petit jurymen; that the name of no negro was presented or drawn as a grand juryman for said term; if the name of a negro had been suggested he would have been placed on the grand jury. It thus appears, so far as the commissioners are concerned, that there was no intentional effort on their part to discriminate against the colored race in the formation of either grand or petit juries, and under the meager proof here offered we are not enabled to say that there was any discrimination against the negro race. On the contrary, it simply occurs that the matter was not brought up to be acted on; and if there were competent negro jurors in that county, which was not shown (although it may be presumed that out of such a number of voters there must have been some competent jurors), still, as the matter is presented, it does not appear that in the formation of either the grand or petit jury the negro race was discriminated against. The failure to select any negro was simply at most an oversight. The court did not err in refusing to quash the indictment or special venire.

During the trial appellant objected to the evidence of certain witnesses regarding tracks found at the scene of the alleged outrage that were similar to tracks made by appellant. The objection urged to this testimony is that said witnesses did not first qualify as experts or persons skilled or familiar with the subject testified about. We do not regard the evidence as to similarity of tracks a matter for expert testimony. A witness in order to identify tracks found at the scene of a transaction with those of an accused, must, before he can testify as to such similarity, show some knowledge in regard to the tracks testified about. He must have measured them or must be enabled to testify to some peculiarity between the tracks found at the scene, and those shown otherwise to have been the tracks made by appellant. This bill does not disclose the con-

ditions under which the opinions or statements of the witnesses were given as to the similarity of tracks found at the scene of the outrage with those made by defendant. In order that the witnesses should have been disqualified to speak upon this matter, the bill should have shown that they made no measurement of the tracks, or that they were not familiar with any peculiarities in the tracks found upon the ground with those made by appellant. As presented by this record, the court did not err in admitting the testimony of the witnesses.

Appellant also complains that the court erred in failing to give an instruction to disregard the testimony of the State's witnesses Trainer and Mahula as to their opinion that the tracks made at the alleged place of the assault were made by the feet of defendant as measured by them at Atkins. When we recur to the testimony of these witnesses, as found in the statement of facts, we believe there was ample testimony to authorize the admission of the evidence of these witnesses as to the similarity of tracks found upon the ground with those of the appellant; and the court was not required to instruct the jury to disregard said tracks.

In motion for new trial, appellant contends that the court erred in permitting to be introduced in evidence against appellant, the record of the age of appellant, with other members of his father's family, found in a book at the home of appellant. In answer to this, it is sufficient to say that no bill of exceptions was reserved to this character of testimony. We make the same observations in regard to the objection urged in appellant's motion for new trial to three jurors who sat on the trial of the case. Appellant urges that said jurors were disqualified because they had not paid their poll tax. But this is neither shown by bill of exceptions or otherwise, save as one of the alleged grounds of the motion for new trial; consequently it can not be considered.

Appellant also craves a reversal because he says the verdict of the jury is not sustained by the evidence. The evidence that prosecutrix was outraged is of a positive character. The evidence as to the identity of appellant being the party who perpetrated the outrage is of a circumstantial character. However, we think it is ample and fully complies with the rule regarding circumstantial evidence; and, in our opinion, shows to a moral certainty, to the exclusion of any other reasonable hypothesis beyond any reasonable doubt, that appellant beforehand formed the design to perpetrate an outrage upon prosecutrix. He lived in the same neighborhood with her, and knew the route she took in going to and returning from school. He lay in wait for her, stripped of his clothes, and wearing a disguise over his face; he rushed upon the little girl, violently seized her; she was evidently overcome with terror, and was thus rendered powerless to resist his purpose. He threw her to the ground, accomplished his object, and then fled. His defense was alibi. The jury evidently did not regard his testimony, but believed the theory of the State; and we see nothing to authorize us to reverse the case. The judgment is accordingly affirmed.

*Affirmed.*